IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DOMINICK CARACILLO

  *Plaintiff,*

  v.

  Civil Action No. ELH-25-cv-2617

XAU VENTURES LLC, *et al.*

  *Defendants*.

**MEMORANDUM OPINION**

In this breach of contract action, plaintiff Dominick Caracillo filed suit against defendants Xau Ventures LLC ("Xau" or "Xau Ventures") and Joshua Lindsey.  ECF 1 (the "Complaint"). [1] The Complaint contains one count, titled "Breach of Contract."  *Id.* at 12.[2]  Caracillo alleges that he loaned $10,000 to Xau and Lindsey, the owner and sole member of Xau, and defendants have not repaid him.  *Id.* ¶¶ 1, 7, 8; ECF 22-1, ¶ 14.

Pursuant to Fed. R. Civ. P. 55(b)(2), plaintiff has moved for entry of default judgment. ECF 19.[3]  The motion is supported by a memorandum (ECF 20) (collectively, the "Motion"), and several exhibits. *See* ECF 20-1 to ECF 20-3.  In the certificate of service for the Motion, plaintiff's counsel attests that defendants were served with the Motion.  *See* ECF 20 at 9.  Neither Xau nor

---

[1] Jurisdiction is predicated on diversity of citizenship. 28 U.S.C. § 1332.  *See* ECF 1, ¶ 5; ECF 22-1.

[2] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

[3] In his filings, plaintiff asserts that he seeks default judgment under Fed. R. Civ. P. 55(b). *See* ECF 20 at 8.  Because plaintiff asks the Court, not the Clerk, to enter a default judgment, the Court shall assume that plaintiff seeks judgment pursuant to Fed. R. Civ. P. 55(b)(2).

Lindsey has responded, and the time to do so has expired.  *See* Local Rule 105.2(a).

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion, as modified.

## I.    Factual Background[4]
### A.

Xau buys, operates, and maintains ATM machines.  ECF 1, ¶ 7.[5]  Caracillo claims that in 2024, Lindsey reached out to him, asking for a loan of $10,000 for Xau, Lindsey's ATM business. *Id.* ¶ 8.  On February 23, 2024, Caracillo as "Lender" and Xau and Lindsey as "Borrower" entered into a "Loan Agreement" for $10,000.  *Id.* ¶ 9; ECF 20-1 (Caracillo Declaration), ¶ 2; ECF 1-1 (the "Agreement").  Borrower also agreed to pay a "Loan Fee" of $2,000.  ECF 1-1, § 1-2.[6]

Further, the Agreement identifies Xau and Lindsey both as Borrower and as guarantor.  *Id.* §§ 2.1, 2.2.  It states, *id.* § 2.1:  "The Borrower hereby guarantees the Loan by its business assets, including any cash and business personal property."  And, § 2.2 states:  "The Borrower also hereby guarantees the Loan by personal guarantee by Joshua Lindsey."

In addition, the Agreement states, *id.* § 1.3: "The borrower is obligated to repay the principal amount and loan fee on the due date, which is 3-8-24."  *See also* ECF 20-1, ¶ 3.  Further, the Agreement provides: "Failure to do so will result in a $1,000 fee for each 7-day period beyond the due date until the full amount is repaid."  ECF 1-1, § 1.3*; see*  ECF 20-1, ¶ 4.  In other words,

---

[4]    Upon default, plaintiff's allegations in the Complaint and the Motion are deemed admitted.  Fed. R. Civ. P. 8(b)(6).  This factual summary is derived from plaintiff's allegations.

[5] "ATM" is a common abbreviation for an automated teller machine.  *ATM*, MERRIAM WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/ATM (last accessed July 4, 2026).

[6] In the Agreement, the terms "Borrower" and "Loan Fee" are usually, but not always, capitalized.  *See* ECF 1-1, §§ 1.1, 1.3 (borrower and loan fee are not capitalized).

after receiving the loan, defendants had two weeks to repay Caracillo. And, for every week that defendants were delinquent in repaying the loan, another $1,000 would be added to defendants' debt. ECF 1-1, § 1.3.

Additionally, § 3.1 of the Agreement specifies: "Lender and Borrower jointly agree that this agreement shall be enforced in the state of Maryland and mutually agree to such venue in the event of any dispute arising from this agreement." *Id.* Additionally, § 3.2 of the Agreement provides: "In the event of any dispute pursuant to this Agreement, Lender shall be entitled to collect all attorney's fees, up to the maximum amount allowed by law, necessary to enforce the provisions of this agreement[.]" *Id.*

Lindsey signed the Agreement as president of Xau Ventures. ECF 1-1 at 2. That same day, plaintiff paid $10,000 to Xau, via a wire transfer. ECF 20-1, ¶ 5; *id.* at 8.

As stated, under the Agreement, defendants' repayment was due on March 8, 2024. ECF 1, ¶ 16; ECF 1-1, § 1.3. That day, "Lindsey stated via text message that a $12,000 wire was processed." ECF 1, ¶ 16. But, "Caracillo did not receive a wire." *Id.* ¶ 17. On March 9, 2024, "Lindsey reconfirmed that the wire was processed" but Caracillo did not receive a wire payment. *Id.* ¶ 18. On March 13, 2024, "Lindsey stated again that the wire was sent," but Caracillo again did not receive it. *Id.* ¶ 19. On March 15, 2024, "Lindsey confirmed that funds had cleared on his end and that he would send payment, wiring $12,000 and delivering $1,000 in cash. Caracillo did not receive a wire." *Id.* ¶ 20. Once again, on March 28, 2024, "Lindsey committed via text to send a wire on April 1st for $15,000. Caracillo did not receive a wire." *Id.* ¶ 21.

Throughout April and May of 2024, Lindsey continued to make empty promises that he would repay the loan. *Id.* at 4. Specifically, on April 12, 2024, "Lindsey committed via text to send a wire on Monday, April 15th." *Id.* ¶ 22. But, "Caracillo did not receive a wire." *Id.* On

3

April 19, 2024, "Lindsey committed to pay $20,000 to be delivered Tuesday, April 23rd." *Id.* ¶ 23. But, Caracillo did not receive any money from defendants. *Id.* On May 3, 2024, "Lindsey sent an apology for not meeting prior commitments, and promised to bring a cashier's check for Monday, May 6th. Caracillo did not receive a cashier's check." *Id.* ¶ 24. And, on May 9, 2024, "Lindsey committed to having funds paid in full before May 13th. Caracillo did not receive the funds." *Id.* ¶ 25. On May 22, 2024, "Lindsey stated that two separate wires of $10,000 each were pending processing and would clear the same day." *Id.* ¶ 26. But, "Caracillo did not receive either wire." *Id.* On May 28, 2024, Lindsey promised a wire confirmation would be sent later that day. But, Caracillo received neither a wire nor any confirmation. *Id.* ¶ 27. On May 29, Lindsey promised "two wires were sent for $10,000 each" and "sent Caracillo a screenshot from May 24th for a wire transfer summary that Lindsey provided to evidence a wire transfer to Caracillo." *Id.* ¶ 28. But, "Caracillo did not receive any wire related to the wire transfer summary." *Id.*

In June 2024, Lindsey continued to make promises to fulfill his payment obligations. *Id.* at 5. On June 4, 2024, Lindsey stated "that he [would] bring funds in cash[.]" *Id.* ¶ 29. Lindsey delayed the cash delivery until June 9th and "subsequently commit[ted] to delivering cash on June 10th." *Id.* But, "Caracillo did not receive any payment." *Id.* Then, on June 13, 2024, "Lindsey commit[ted] to send two separate wires by June 18th." *Id.* ¶ 30. But, "Caracillo did not receive either wire." *Id.* On June 27, "Lindsey agree[d] to meet after 11am with cash for Caracillo," but "Caracillo did not receive any cash." *Id.* ¶ 31.

On July 11, 2024, Lindsey promised to pay $20,000 on July 16th, in cash, but Caracillo did not receive payment. *Id.* ¶ 32. On July 22, 2024, Lindsey agreed to pay "$10,000 by cash and $10,000 by wire" but again, Caracillo did not receive any money. *Id.* ¶ 33. On August 2, 2024, Lindsey claimed he had $250,000 "clearing for his business and" would pay $20,000 "on Monday

August 5th." *Id.* ¶ 34. But, "Caracillo did not receive a payment." *Id.* On August 17, 2024, Lindsey committed "to delivering a $10,000 wire on August 21st and another $10,000 wire on August 23rd." *Id.* ¶ 35. But, "Caracillo did not receive payment." *Id.*

Then, on September 6, 2024, Lindsey promised to have "a cashier's check scheduled for payment on Tuesday, September 10th", but Caracillo did not receive payment. *Id.* ¶ 36. On September 23, 2024, Lindsey committed "to having funds paid by the end of the week. Caracillo did not receive payment." *Id.* ¶ 37. On October 18, 2024, Lindsey promised to pay Caracillo $20,000 before the end of the month, but Caracillo did not receive any money. *Id.* ¶ 38.

On November 18, 2024, Lindsey again promised to send a wire for $20,000, but Caracillo did not receive one. *Id.* ¶ 39. On November 26, 2024, "Lindsey renewed his commitment to send a $20,000 wire. Caracillo did not receive payment." *Id.* ¶ 40. On December 13, 2024, "Lindsey claimed an ACH [7] payment was sent and would clear by December 16, 2024," but Caracillo did not receive payment. *Id.* ¶ 41.

Then, on January 6, 2025, "Lindsey committed to delivering $12,500 in cash. Caracillo did not receive payment." *Id.* ¶ 42. On January 10, 2025, "Lindsey made a new commitment to deliver $12,500 in cash towards the debt by this date." *Id.* ¶ 43. But, "Caracillo did not receive payment." *Id.* On January 17, 2025, Lindsey promised to deliver $20,000 in cash to plaintiff by January 21, 2025. *Id.* ¶ 44. Caracillo did not receive any payment. *Id.*

On February 4, 2025, "Lindsey committed to pay $20,000," but Caracillo "did not receive payment." *Id.* ¶ 45. That same day, "Lindsey's commitment changed to two payments of $10,000 each, one on February 4, one on February 6." *Id.* ¶ 46. But, Caracillo did not receive either

---

[7] ACH is an abbreviation for "automated clearinghouse" and "refers to a nationwide system used to electronically transfer money." *What Is An ACH Payment and How Does It Work?* FORBES, https://perma.cc/XAF7-77KY (last accessed July 22, 2026).

payment. *Id.* "Lindsey committed to pay $20,000" on February 7, 2025. *Id.* ¶ 47. But, Caracillo did not receive any money. *Id*. On February 8, 2025, "Lindsey committed to pay $20,000 in cash, then changed his commitment to pay by wire." *Id.* ¶ 48. But, Caracillo "did not receive payment." *Id.* On February 10, 2025, "Lindsey confirmed he would make payment," but Caracillo "did not receive payment." *Id.* ¶ 49.

On February 11 and 12, 2025, "Lindsey reiterated his intent to pay and claimed payment was being coordinated. Caracillo did not receive payment." *Id.* ¶ 50. On February 13, 2025, "Lindsey indicated full payment would be handled that day. Caracillo did not receive payment." *Id.* ¶ 51. On February 14, 2025, "Lindsey claimed the bank was 'processing' and payment would be complete." *Id.* ¶ 52. But, Caracillo did not receive any money. *Id.* On February 17 and 18, 2025, "Lindsey confirmed a payment plan and that funds were ready. Caracillo did not receive payment." *Id.* ¶ 53. On February 19, 2025, "Lindsey committed to deliver a payment in cash. Caracillo did not receive payment." *Id.* ¶ 54. On February 20 and 21, 2025, "Lindsey provided follow-up confirmations of payment without delivery. Caracillo did not receive payment." *Id.* ¶ 55. On February 24, 2025, "Lindsey claimed the delay was 'just timing' and reiterated a promise to finalize it. Caracillo did not receive payment." *Id.* ¶ 56. On February 25, 2025, "Lindsey stated payment would be dropped off in cash. Caracillo did not receive payment." *Id.* ¶ 57.[8] From February 26 through 28, 2025, "Lindsey reconfirmed his intention to resolve the debt that week. Caracillo did not receive payment." *Id.* ¶ 58.

On March 4 and 5, 2025, "Lindsey claimed funds were 'ready' and committed to bringing a cashier's check. Caracillo did not receive payment." *Id.* ¶ 59. On March 6 and 7, 2025, "Lindsey

---

[8] Plaintiff does not specify whether this promise was oral or in writing. *See* ECF 1, ¶ 57. But, the text messages between plaintiff and Mr. Lindsey from February 25, 2025, do not reflect that Lindsey made this statement to plaintiff via text message. *See* ECF 1-2 at 88.

promised to drop off full payment in cash. Caracillo did not receive payment." *Id.* ¶ 60. From March 10 through 13, 2025, "Lindsey sent daily text confirmations that payment delivery would happen that day. Caracillo did not receive payment." *Id.* ¶ 61. On March 14 and 15, 2025, "Lindsey stated $22,500 was in hand and would be dropped off immediately. Caracillo did not receive payment." *Id.* ¶ 62. On March 17 and 18, 2025, "Lindsey rescheduled prior commitments to the following day. Caracillo did not receive payment." *Id.* ¶ 63. On March 19, 2025, "Lindsey claimed '100% today' and that he was on his way. Caracillo did not receive payment." *Id.* ¶ 64.

Then, on March 20 and 21, 2025, "Lindsey offered multiple assurances that payment was still coming. Caracillo did not receive payment." *Id.* ¶ 65. On March 24 and 25, 2025, "Lindsey claimed wires were being processed. Caracillo did not receive payment." *Id.* ¶ 66. On March 26, 2025, "Lindsey promised to drop off funds at a specified location. Caracillo did not receive payment." *Id.* ¶ 67. On March 28, 2025, "Lindsey claimed resolution would occur by the following Monday. Caracillo did not receive payment." *Id.* ¶ 68.

From April 1 through April 3, 2025, "Lindsey promised a wire would be finalized. Caracillo did not receive payment." *Id.* ¶ 69. On April 4 and 5, 2025, "Lindsey claimed he was on his way with funds. Caracillo did not receive payment." *Id.* ¶ 70. From April 7 through April 9, 2025, "Lindsey stated that funds were secured and would be delivered that week. Caracillo did not receive payment." *Id.* ¶ 71. On April 11, 2025, "Lindsey stated he would bring the amount in person. Caracillo did not receive payment." *Id.* ¶ 72. On April 15, 2025, "Lindsey promised to resolve the balance by the end of the week. Caracillo did not receive payment." *Id.* ¶ 73. On April 18, 2025, "Lindsey stated wire instructions had been processed. Caracillo did not receive payment." *Id.* ¶ 74. On April 22 and 23, 2025, "Lindsey delayed earlier commitments and

promised to complete payment delivery. Caracillo did not receive payment." *Id*. ¶ 75.  On April 26, 2025, "Lindsey claimed a $20,000 wire was sent. Caracillo did not receive payment." *Id*. ¶ 76.

On May 1 and 2, 2025, "Lindsey stated a cash drop would happen that afternoon. Caracillo did not receive payment." *Id*. ¶ 77.  On May 5 and 6, 2025, "Lindsey reconfirmed his commitment to a full payment delivery in cash. Caracillo did not receive payment." *Id*. ¶ 78.  On May 9, 2025, "Lindsey claimed to be arriving with funds. Caracillo did not receive payment." *Id*. ¶ 79.  From May 13 to May 15, 2025, "Lindsey reiterated that a wire was being handled by a banker. Caracillo did not receive payment." *Id*. ¶ 80.  On May 20, 2025, "Lindsey committed to finalize the debt repayment by Friday. Caracillo did not receive payment." *Id*. ¶ 81.  On May 23, 2025, "Lindsey promised resolution before the holiday weekend. Caracillo did not receive payment." *Id*. ¶ 82.

On June 2 and June 3, 2025, "Lindsey claimed a wire was being sent that morning. Caracillo did not receive payment." *Id*. ¶ 83. On June 6, 2025, "Lindsey promised to bring the amount for repayment by 2 p.m. Caracillo did not receive payment." *Id*. ¶ 84. On June 9 through June 11, 2025, "Lindsey rescheduled a previously committed cash delivery. Caracillo did not receive payment." *Id*.¶ 85. Between June 14 and June 17, 2025, "Lindsey stated he had secured the $20,000. Caracillo did not receive payment." *Id*. ¶ 86.  On June 20, 2025, "Lindsey texted he was 'driving over now' to make payment. Caracillo did not receive payment." *Id*. ¶ 87.

On July 1, 2025, "Lindsey claimed funds were available and being delivered. Caracillo did not receive payment." *Id*. ¶ 88.  From July 3 to July 5, 2025, "Lindsey cited a holiday delay but confirmed his intention to deliver." *Id*. ¶ 89.  But, "Caracillo did not receive payment." *Id*.  On July 8 and 9, 2025, "Lindsey reiterated he would drop off payment by the end of the day.  Caracillo did not receive payment." *Id*. ¶ 90.  On July 11, 2025, "Lindsey stated 'I have it all here' and confirmed the delivery plan. Caracillo did not receive payment." *Id*. ¶ 91.  On July 15 and 16,

8

2025, "Lindsey promised delivery of a check. Caracillo did not receive payment." *Id.* ¶ 92. From July 19 through July 22, 2025, "Lindsey promised to send a wire. Caracillo did not receive payment." *Id.* ¶ 93.

As of August 7, 2025, the date Caracillo filed suit, defendants had not repaid the debt. *Id.* ¶ 94. Caracillo asserts: "Lindsey's repeated false promises to repay have been with actual malice because they are intentional, fraudulent, and motivated by the purpose of stringing Caracillo along without compensation." *Id.* ¶ 95.

In total, Caracillo claims that as of August 7, 2025, the date he filed suit, 73 weeks had passed since the due date of March 8, 2024, resulting in "$73,000 in late fees pursuant to the Agreement." *Id.* ¶ 96. Further, Caracillo asserts that defendants owe "$12,000 in principal and loan fee plus $73,000 in late fees pursuant to Sec. 1.3 of the Agreement." *Id.* ¶ 97. And, he alleges: "Defendants owe Caracillo's attorneys' fees pursuant to Sec. 3.2 of the Agreement." *Id.* ¶ 98.

Caracillo appended a series of text message exchanges between Lindsey and Caracillo as an exhibit. ECF 1-2. These messages demonstrate that Caracillo spent months attempting to collect payment from Lindsey, only to receive empty promises of cash or wire payments that never materialized. *See id.* As of the date of filing the Complaint, Caracillo sought $85,000 in damages "plus pre- and post-judgment interest, and the costs" of bringing suit. ECF 1 at 12. In the Motion, Caracillo seeks contractual damages in the amount of $102,000, $5,000 in attorneys' fees, and costs in the amount of $735. ECF 20 at 8.

**B.**

Plaintiff filed suit on August 7, 2025. ECF 1. The case was initially assigned to Magistrate

9

Judge J. Mark Coulson.  ECF 4.  After multiple unsuccessful attempts[9] to serve Xau's registered agent as well as Lindsey at his last known addresses, plaintiff moved, pursuant to Fed. R. Civ. P. 4(f)(3), for an order permitting service of process to defendants' email: cashexllc@gmail.com. ECF 10 ("Service Motion").  In particular, plaintiff alleged, *id.* at 2 (quoting ECF 10-1 at 2):

> [T]he Defendants must generally utilize email so that they may communicate with colleagues regarding issues related to their cash ATM business.  As such, it is far more likely that Defendants can be served electronically than through traditional service of process methods.  Indeed, Defendant Lindsey has responded to Plaintiff's counsel regarding this lawsuit and even admitted "full responsibility" via email this month.

Plaintiff provided Judge Coulson with a copy of email correspondence between plaintiff's counsel, Erik Lund, and Mr. Lindsey in September 2025.  ECF 10-1 at 2.  The correspondence reflects that Mr. Lund sent an email to cashexllc@gmail.com and Mr. Lindsey responded from that same email address.  *Id.*  Plaintiff's counsel claims that this email address is Mr. Lindsey's "known email address."  ECF 13-1, ¶ 7.[10]

In particular, ECF 10-1 reflects that on September 12, 2025, the following email exchange took place between plaintiff's counsel and Mr. Lindsey, *id.* at 2:

**Mr. Lund:**

Mr. Lindsey,

A lawsuit has been filed against you in Federal District Court for the District of Maryland. A copy of the complaint and the Magistrate's order are attached.  Do you have an attorney retained that you would like us to send a copy of these documents to?

Best Regards,

Erik

---

[9] In particular, plaintiff "attempted service at Xau Venture's listed registered agent twice, Mr. Lindsey's home address, and Mr. Lindsey's ex-fiancé's address where Mr. Lindsey was known to be living for a short period of time but has now left."  ECF 10 at 2; *see* ECF 10-2.

[10]  ECF 13-1 consists of multiple exhibits that were docketed collectively.

**Mr. Lindsey:**

No I do not have legal council [sic] and I have stated to Dominic that these funds are being returned late yes full responsibility but he will Have them asap

In reviewing the Service Motion, Judge Coulson observed: "Plaintiff's failed personal service attempts and Defendant Lindsey's responsiveness over e-mail suggest that while Defendant XAU Ventures LLC is not reachable at a physical address, it is reachable by e-mail." ECF 12 at 2. Therefore, by Memorandum Opinion and Order dated September 18, 2025 (ECF 12), Judge Coulson concluded that "service by e-mail to cashexllc@gmail.com is reasonably calculated under these circumstances to apprise Defendant XAU Ventures of the action and present it an opportunity to present objections." *Id.* at 3. Accordingly, he granted the Service Motion. *Id.*

On September 18, 2025, five days after plaintiff's lawyer emailed the Complaint to Lindsey (*see* ECF 13-1 at 11), Mr. Lund emailed Lindsey at cashexllc@gmail.com, attaching the Memorandum Opinion and Order, *i.e.*, ECF 12, granting the Service Motion. ECF 13-1 (Lund Declaration), ¶ 10; *see* ECF 13-1 at 14. In the same email, Mr. Lund advised Mr. Lindsey that he had "been deemed served" and had "21 days to submit" his "Answer to the Complaint with the Court." *Id.* at 14.

Defendants did not respond to the suit. *See* Docket. As a result, on October 14, 2025, plaintiff moved for an order of default against defendants. ECF 13. The Clerk entered an order of default against defendants on October 27, 2025. ECF 14; ECF 16.

On the same date, the Clerk mailed a "Notice Of Default" to both defendants. ECF 15; ECF 17 ("Notice"); ECF 18. The Notice informed defendants that "an order of default was entered" against them and that defendants had thirty days from the date of the Notice to "file a motion to vacate the order of default." ECF 15 at 1. In addition, the Notice warned defendants

11

that if they did "not take action," the Court would "act promptly on any pending motions for entry of default judgment, which may result in a monetary judgment against" each defendant. *Id.*

The Notice to Xau, sent to an address in Glen Burnie, Maryland, was returned to the Clerk on November 6, 2025. ECF 18. But, the Notice to Lindsey was not returned. Because Lindsey is the only member of Xau and its owner, the Court is satisfied that defendants received the Notice when it was delivered to Mr. Lindsey. *See Vinny's Towing & Recovery v. KBI Sols., LLC*, BAH-24-1044, 2025 WL 3637068, at *3 (D. Md. Dec. 16, 2025) ("'If the limited liability company has no resident agent or if a good faith attempt to serve the resident agent has failed, service may be made upon any member or other person expressly or impliedly authorized to receive service of process.'") (quoting Md. Rule 2-124(h)).

On December 4, 2025, pursuant to Fed. R. Civ. P. 55(b)(2), plaintiff moved for entry of default judgment. ECF 19. In the certificates of service for the Motion (ECF 19 at 3) and supporting memoranda (ECF 20 at 9; ECF 22 at 3), plaintiff avers that he has sent a copy of his submissions to "Defendants via email to cashexllc@gmail.com in accordance with this Court's order permitting email service." *See, e.g.,* ECF 22 at 3. Therefore, the Court is satisfied that defendants have been given notice of plaintiff's efforts to secure a default judgment against them.

## II.    Legal Principles

### A.    Fed. R. Civ. P. 54 and 55

Rule 55(b) of the Federal Rules of Civil Procedure governs default judgment. In particular, Rule 55(b)(1) provides that the clerk may enter a default judgment if plaintiff's claim is "for a sum certain or a sum that can be made certain by computation."[11] But, "[a] plaintiff's assertion of a

---

[11] If the sum is not certain or ascertainable through computation, the court looks to Rule 55(b)(2) ("The court may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to: (A) conduct an accounting;

12

sum in a complaint does not make the sum 'certain' unless the plaintiff claims liquidated damages; otherwise, the complaint must be supported by affidavit or documentary evidence." *Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 794 (D. Md. 2010) (Grimm, M.J.).[12]

Rule 55(b)(2) states, in part: "In all other cases, the party must apply to the court for a default judgment." In *Aleman v. Marroquin*, GLR-23-2475, 2025 WL 2050959, at *2 (D. Md. July 22, 2025), the court explained: "If, after entry of default, the Plaintiff's complaint does not specify a sum certain amount of damages, the court may enter a default judgment against the defendant pursuant to Rule 55(b)(2)." (Internal quotation marks omitted).

Further, Rule 55(b)(2) provides that the court "may conduct hearings or make referrals--preserving any federal statutory right to a jury trial--when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter."

The Fourth Circuit has a "strong policy favoring the disposition of cases on the merits . . . ." *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 229 (4th Cir. 2019) (discussing *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993)), *cert. denied*, 588 U.S. 909 (2019); *see Projects Mgmt. Co. v. Dyncorp Int'l LLC*, 734 F.3d 366, 376 (4th Cir. 2013); *Benchmark Ins. Co. v. Total Remodeling Contractor LLC*, LKG-25-00811, 2026 WL 319051, at *3 (D. Md. Feb. 6, 2026). However, the policy is not absolute. Entry of default judgment under Rule 55(b)(2) "is left to the discretion of the court." *SEC v. Lawbaugh*, 359 F. Supp. 2d 418, 421 (D. Md. 2005).

---

(B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.").

[12] Judge Grimm authored *Monge* when he served as a United States Magistrate Judge. He subsequently served as a United States District Court Judge in Maryland. Judge Grimm retired from judicial service in December 2022.

And, default judgment "'is appropriate when the adversary process has been halted because of an essentially unresponsive party.'" *Garnier-Thiebaut, Inc. v. Castello 1935 Inc.*, SDT-17-3632, 2019 WL 6696694, at *1 (D. Md. Dec. 6, 2019) (Thacker, J.) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. Cap. Restoration & Painting Co.*, 919 F. Supp. 2d 680, 684 (D. Md. 2013)); *see Lawbaugh*, 359 F. Supp. 2d at 421.

When an order of default is entered, plaintiff's factual allegations are deemed admitted, except those pertaining to damages. *See* Fed. R. Civ. P. 8(b)(6); *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001) (stating that because of the default, the court accepts as true the well pleaded factual allegations in the Complaint as to liability); *United States v. Bob Bakers Golden Servs. Inc.*, PX-22-191, 2023 WL 3304897, at *2 (D. Md. May 8, 2023). Nevertheless, with respect to a motion for default judgment, the court must determine whether the undisputed factual allegations constitute a legitimate cause of action. *Id.* at 780–81. If the court is satisfied that liability has been established, it must then determine the appropriate amount of damages. *Id.*; *see Bob Bakers Golden Servs. Inc.*, 2023 WL 3304897, at *2; *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999).

Notably, allegations "relating to the amount of damages" are not deemed admitted based on a defendant's failure to respond to a suit. Fed R. Civ. P. 8(b)(6); *see Monge*, 751 Supp. 2d at 794; *Trs. Of the Elec. Welfare Trust Fund v. MH Passa Elec. Contracting, Inc.*, DKC-08-2805, 2009 WL 2982951, at *1 (D. Md. Sept. 14, 2009) ("Upon default, the well-pled allegations in a complaint as to liability are taken as true, although the allegations as to damages are not."); *Pentech Fin. Servs., Inc. v. Old Dominion Saw Works, Inc.*, NKM-09-0004, 2009 WL 1872535, at *1 (W.D. Va. June 30, 2009) ("Upon default judgment, Plaintiff's factual allegations are accepted as true for all purposes excluding determination of damages."); *United States v. Bob Bakers Golden Servs.*

14

*Inc.*, PX-22-191, 2023 WL 3304897, at *2 (D. Md. May 8, 2023).  Rather, the court must make an independent determination regarding damages.  *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 154 (2d Cir. 1999).

In so doing, the court may conduct an evidentiary hearing.  Fed. R. Civ. P. 55(b)(2).  However, the court may also make a determination of damages without a hearing, so long as there is an adequate evidentiary basis in the record to support an award of the requested damages.  *See Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001) ("[T]he court may rely on detailed affidavits or documentary evidence to determine the appropriate sum."); *see also Trustees of the Nat'l Asbestos Workers Pension Fund v. Ideal Insulation, Inc.*, ELH-11-832, 2011 WL 5151067, at *4 (D. Md. Oct. 27, 2011) (determining that, in a case of default judgment against an employer, "the Court may award damages without a hearing if the record supports the damages requested"); *Monge,* 751 F. Supp. 2d at 795 (same); *Pentech Fin. Servs., Inc.*, 2009 WL 1872535, at *2 (concluding that there was "no need to convene a formal evidentiary hearing on the issue of damages" after default judgment because plaintiff submitted affidavits and records establishing the amount of damages); *JTH Tax, Inc. v. Smith*, RAJ-06-0076, 2006 WL 1982762, at *3 (E.D. Va. June 23, 2006) ("If the defendant does not contest the amount pleaded in the complaint and the claim is for a sum that is certain or easily computable, the judgment can be entered for that amount without further hearing.").

Fed. R. Civ. P. 54(c) is also pertinent.  It provides that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  *See In re Genesys Data Techs, Inc.*, 204 F.3d 124, 132 (4th Cir. 2000) ("When a Complaint demands a specific amount of damages, courts have generally held that a default judgment cannot award additional damages.").

This is meant to enable the defendant to decide whether to expend the resources to defend the action. *Monge*, 751 F. Supp. 2d at 796.

### B.  Choice of Law

In regard to state law claims litigated in federal court based on diversity jurisdiction, federal courts apply federal procedural law and the substantive law of the state in which the proceeding is brought. *See*, *e.g.*, *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938); *Leichling v. Honeywell Intern., Inc.*, 842 F.3d 848, 851 (4th Cir. 2016); *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 74 (4th Cir. 2016); *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *see also, e.g.*, *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97 (1941); *Prof'l Massage Training Cent., Inc. v. Accreditation Alliance of Career Schools and Colls.*, 781 F.3d 161, 180 (4th Cir. 2015); *Demetres v. E. W. Const. Inc.*, 776 F.3d 271, 273 (4th Cir. 2015); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 652-53 (4th Cir. 2010).  Maryland is the forum state.

With respect to contract claims, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state. *See, e.g., Oliveira v. Sugarman*, 451 Md. 208, 233 n.17, 152 A.3d 728, 743 n.17 (2017); *Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014).

The Agreement contains a choice of law provision.  As noted, § 3.1 of the Agreement provides: "Lender and Borrower jointly agree that this agreement shall be enforced in the state of Maryland and mutually agree to such venue in the event of any dispute arising from this agreement." ECF 1-1 at 2.  Therefore, I shall apply Maryland law.

### C. Contract Principles

The Complaint lodges a claim for breach of contract. ECF 1, ¶¶ 100–03. In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2–3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421–22 (Hollander, J.), *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).

Under Maryland law, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'" *Tucker v. Specialized Loan Servicing, LLC*, 83 F. Supp. 3d 635, 655 (D. Md. 2015) (quoting *Kumar v. Dhanda*, 198 Md. App. 337, 17 A.3d 744, 749 (2011)). To "prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *accord Belyakov v. Med. Sci. & Computing*, 86 F. Supp. 3d 430, 437 (D. Md. 2015); *see also RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 658, 994 A.2d 430, 442 (2010).

Of relevance, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). In *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012), the Maryland Court of Appeals[13] said: "Maryland law requires that a plaintiff alleging a breach of contract 'must

---

[13] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate*

of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (Citation omitted) (emphasis in *Polek*); *see also Robinson v. GEO Licensing Co., L.L.C.*, 173 F. Supp. 2d 419, 423 (D. Md. 2001).

"In most contract cases, the law of compensatory damages applies, providing a standard measure of compensation limited to the amount of injury incurred under a breach of the contract." *Willard Packaging Co. v. Javier,* 169 Md. App. 109, 122, 899 A.2d 940, 947 (2006). In Maryland, "damages for breach of contract ordinarily are that sum which would place the plaintiff in as good a position as the plaintiff would have been, had the contract been performed." *Tecore, Inc. v. Republic of Yemen*, LKG-23-2230, 2026 WL 1295360, at *5 (D. Md. May 12, 2026).

Under Maryland law, the measure of damages in a breach of contract action is well settled: "'[U]pon proof of liability, the non-breaching party may recover damages for 1) the losses proximately caused by the breach, 2) that were reasonably foreseeable, and 3) that have been proven with reasonable certainty.'" *Adcor Indus., Inc. v. Beretta U.S.A. Corp.*, 250 Md. App. 135, 154, 248 A.3d 1137, 1147 (2021) (quoting *Hoang v. Hewitt Ave. Assocs., LLC*, 177 Md. App. 562, 594, 936 A.2d 915, 934 (2007)).[14]

"'[P]roximate cause' means losses that actually resulted from the breach.'" *Havtech, LLC v. Tobey-Karg Sales Agency, Inc.*, JRR-22-01051, 2024 WL 3554990, at *9 (D. Md. July 26, 2024) (quoting *Adcor Indus.*, 250 Md. App. at 154, 248 A.3d at 1147). As to the second factor, reasonable foreseeability, "Maryland follows the two-part principle established in *Hadley v.*

---

*Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. However, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

[14] Additionally, plaintiffs have the "obligation to mitigate damages." *Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship,* 376 Md. 331, 355, 829 A.2d 976, 990 (2003).

*Baxendale,* 9 Exch. 341, 156 Eng. Rep. 145 (1854), for recovery of damages for breach of contract." *Hoang,* 177 Md. App. at 594, 936 A.2d at 934.

The *Hoang* Court explained*, id.* at 594–95, 936 A.2d at 934–35 (internal citations and quotation marks omitted) (emphasis in original):

> The first aspect of that principle holds that when a contract has been breached, the non-breaching party is entitled to damages for the breach such as may fairly and reasonably be considered as arising naturally, *i.e.,* according to the usual course of things from such a breach of contract itself[.]  In other words, the plaintiff in a breach of contract action may recover general damages of the sort that are presumed to have been in the contemplation of the parties when the contract was made.
>
> Under the second aspect of the principle set forth in *Hadley v. Baxendale,* a plaintiff in a breach of contract action also is entitled to recover damages such as may fairly and reasonably be supposed to *have been in the contemplation of both parties* at the time they made the contract, as the probable result of the breach of it. Such special or consequential damages are not presumed to have been in the contemplation of the parties when they made their contract but may be shown from evidence of the particular circumstances to have been in their contemplation.

As to the third element, "'[l]osses that are speculative, hypothetical, remote, or contingent either in eventuality or amount will not qualify as reasonably certain' and are not recoverable as contract damages." *Fort Myer Constr. Corp. v. Banneker Ventures LLC*, No. 1002, Sept.term, 2019, 2021 WL 5234692, at *21 (Md. Ct. Spec. App. Nov. 10, 2021).  In the "context of lost profits recovery for breach of contract evidence must show that breach was a substantial factor in causing the loss[.]" *Hoang*, 177 Md. App. at 607, 936 A.2d at 942 (citing cases).

### III.   Discussion

### A.  Liability

Caracillo alleges that he entered a contract with Xau and Lindsey, the owner of Xau, to loan defendants $10,000, and that defendants have failed and refused to repay the loan amount, the Loan Fee, and accrued charges.  ECF 1, ¶¶ 96, 97, 101.  Indeed, Caracillo has not received any money from defendants.  He also seeks attorney's fees, pursuant to the terms of the Agreement.

In particular, Caracillo contends that, pursuant to the Agreement, Caracillo and defendants formed a valid and enforceable contract for a $10,000 loan. *Id.* ¶ 101.[15]   Lindsey personally guaranteed the agreement. ECF 1-1, § 2.2.   According to Caracillo, defendants breached the contract by failing to repay the principal amount of the loan and the Loan Fee, due by March 8, 2024, in accordance with the terms of the contract. ECF 1, ¶ 102; ECF 1-1.

Plaintiff's allegations are supported by copies of the Agreement (ECF 1-1); copies of text messages exchanged between Caracillo and Lindsey, documenting Caracillo's repeated attempts to collect repayment on the loan and Lindsey's repeated promises to fulfill defendants' contractual obligation; and declarations. *See* ECF 1-2; ECF 20-1 at 2–4; ECF 22-1 at 1–3; ECF 22-2 at 1–3. Given the posture of the case, plaintiff's allegations are deemed admitted. Fed. R. Civ. P. 8(b)(6). Therefore, I am satisfied that Caracillo has established a breach of contract by Lindsey and Xau.

## B.  Remedies

### 1.  Compensatory Damages

Caracillo alleges that defendants entered an Agreement in which Caracillo agreed to loan Xau Ventures and Lindsey $10,000. Defendants were to repay the debt by March 8, 2024, along with the "Loan Fee" of $2,000. ECF 1-1, §§ 1.1, 1.2, 1.3. And, the Agreement provided for a late fee of $1,000 per week. *Id.* § 1.3. But, the monies were never paid. ECF 20 at 2. Therefore, plaintiff seeks "$10,000 in returned principal, $2,000 in loan fee, and $90,000 in late fees," yielding a total of $102,000 in compensatory damages. *Id.* at 7.

As discussed, under the Agreement, defendants were obligated to repay the principal amount of $10,000 and a Loan Fee of $2,000 on March 8, 2024. ECF 1-1, §§ 1.1, 1.2. And, per

---

[15] As noted, the Agreement identifies both Xau and Lindsey as the "Borrower." *See* ECF 1-1 at 2. Lindsey is also identified as a guarantor. *Id.* § 2.2.

the Agreement, for each week that defendants did not repay the debt, a fee of $1,000 would accrue. *Id.* § 1.3. The Agreement does not specify an interest rate for the loan. *See* ECF 1-1. In addition to being a borrower, Lindsey also guaranteed the loan. *Id.*, § 2.2.

Despite Lindsey's repeated promises to repay the loan, "Caracillo has never received a payment from Defendants under the Agreement." ECF 20 at 2. As of the date of the filing of the Motion, December 4, 2025, ninety (90) weeks had passed since the loan payment of $10,000 was due, along with the Loan Fee. ECF 20 at 7. Therefore, under the terms of the Agreement, plaintiff claims that defendants owe an additional $90,000 in late fees. *See id*.

Although plaintiff refers to the charges for delinquent repayment as a "late fee," *see* ECF 1, ¶ 11, the Agreement does not use that terminology. ECF 1-1 at 2. Rather, the Agreement provides, *id.* § 1.3: "The borrower is obligated to repay the principal amount and loan fee on the due date, which is 3-8 24. Failure to do so will result in a $1000 fee for each 7-day period beyond the due date until the full amount is repaid."

Maryland Code (2013 Repl. Vol., 2025 Supp.), § 12-105 of the Commercial Law Article ("C.L.") is titled "Charges not considered interest." "[L]ate charges" are among the charges that are not considered interest. *Id.* § 12-105(c)(3). In particular C.L. § 12-105(c)(3) defines a late charge as:

> (3) A delinquent or late charge of the greater of $2 or 5 percent of the total amount of any delinquent or late periodic installment of principal and interest, if:
>
> > (i) The delinquency has continued for at least 15 calendar days; and
> >
> > (ii) A delinquent or late charge has not already been charged for the same delinquency[.]

21

Clearly, $90,000 exceeds both $2 and five percent of any periodic installment of payment of principal and interest.[16]  Even five percent of the entire principal, *i.e.*, $500, is far less than the requested $90,000, and less than the weekly delinquent fee of $1,000.  Therefore, although plaintiff refers to the $90,000 he seeks to recover under the Agreement as late fees, it is not a late charge within the meaning of C.L. § 12-105(c)(3).

The definition of "interest," codified at C.L. § 12-101(e), is broad.  C.L. § 12-101(e) defines "interest" as follows:

> "Interest" means, except as specifically provided in § 12-105 of this subtitle or § 12-1501[17] of this title, any compensation directly or indirectly imposed by a lender for the extension of credit for the use or forbearance of money, including any loan fee, origination fee, service and carrying charge, investigator's fee, time-price differential, and any amount payable as a discount or point or otherwise payable for services.

C.L. § 12-101(l) defines "Simple interest" as the "interest charged on the principal amount loaned to the borrower."  C.L. § 12-105 specifies charges that are not considered interest, as referenced earlier.  And, C.L. § 12-101(o) defines "Usury" as "the charging of interest by a lender in an amount which is greater than that allowed by this subtitle."

The amount plaintiff seeks to recover for defendant's failure to timely repay the loan ($90,000) constitutes "compensation . . . imposed by a lender for the extension of credit for the use . . . of money," and therefore falls within the definition of interest in C.L. § 12-101(e).

---

[16] The Agreement did not provide for periodic installments for repayment of the principal ($10,000).

[17] In May 2025, "the Maryland General Assembly passed House Bill 1294, effective October 1, 2025, which added Subtitle 15 ('Earned Wage Access') to Title 12 ('Credit Regulations') of the Commercial Law Article, *see* Md. Code Ann., Com. Law §§ 12-1501 to 12-1507[.]" *Mayor & City Council of Baltimore v. MoneyLion Techs. Inc.*, SAG-25-03692, 2026 WL 1532962, at *1 (D. Md. June 1, 2026).  The definitions codified at C.L. § 12-1501 are not relevant to the loan at issue in this case; they concern regulations on earned wages.

Similarly, the $2,000 "Loan Fee", ECF 1-1, § 1.2, is a loan fee or "origination fee" to compensate the Lender for extending credit to the Borrower.  It also qualifies as interest under Maryland law. *See* C.L. § 12-101(e).

A charge of $1,000 per week on a loan of $10,000 amounts to an *annual* simple interest rate of 520%.  And, a charge of $2,000, labeled here as a Loan Fee, amounts to an interest rate of 20% with respect to a $10,000 loan.

Notably, "the Maryland Usury Law covers not only the stated rate of interest, but also, in general, 'any compensation' required by a lender 'directly or indirectly' related to 'the extension of credit for the use or forbearance of money,' including '*any loan fee, origination fee*, service and carrying charge, investigator's fee, time-price differential, and any amount payable as a discount . . .'" *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 159, 258 A.3d 296, 302 (2021) (quoting C.L. §12-101(e)) (emphasis added).  Although "parties to a contract can expressly include an interest rate as one of the terms of their agreement . . . a court must examine whether the stated interest rate is greater than a rate allowed under Maryland law." *Dauda v. Jean*, GLS-23-00174, 2024 WL 4007946, at *9 (D. Md. Aug. 30, 2024).  The $90,000 in late fees and the $2,000 Loan Fee that plaintiff seeks to recover are subject to "usury limitations found in C.L. §§ 12-101(e), 12-105(e)." *See Price v. 21st Mortg. Corp.*, ELH-21-3017, 2023 WL 2213927, at *11 (D. Md. Feb. 23, 2023).

"Under Maryland law, a lender commits '[u]sury' by 'charging . . . interest . . . in an amount which is greater than that allowed by' § 12, Subtitle 1 of Maryland's Commercial Code." *Small Bus. Fin. Sols., LLC v. Cavalry, LLC*, DKC-22-1383, 2023 WL 284449, at *3 (D. Md. Jan. 18, 2023) (citation omitted).  Maryland law provides a "General legal rate of interest" of "6 percent per annum on the unpaid principal balance of a loan." C.L. § 12-102; *see United Cable Television of Baltimore Ltd. P'ship v. Burch*, 354 Md. 658, 683, 732 A.2d 887, 900 (1999) ("The

23

constitutionalized public policy of Maryland remains that the legal rate of interest is six percent and that, if any changes in that rate are to be made, they are to be made by the General Assembly.").

But, there are several exceptions to this interest cap. *Cavalry*, 2023 WL 284449, at *3; *see Burch*, 354 Md. at 683, 732 A.2d at 901 ("The largest class of transactions created by the General Assembly as to which there is no limitation on interest is certain commercial loans. *See* CL § 12–103(e)(1)."). One exception is found in C.L. § 12-103(a)(1). It provides for simple interest up to 8 percent per annum on the unpaid principal balance of a loan under a written agreement signed by the borrower. Moreover, if a loan is secured by a pledge of collateral which is other than a savings account, or if the loan is unsecured, the lender may charge up to 18% interest. C.L. § 12-103(a)(3).

C.L. § 12-103(e) is sometimes referred to as the as the "commercial loan exemption." *Duckworth v. Bernstein*, 55 Md. App. 710, 720, 466 A.2d 517, 522 (1983). A "commercial loan" is defined in C.L. § 12-101(c)(1) and (2). It is a "loan which is made: (1) Solely to acquire or carry on a business or commercial enterprise; or (2) To any business or commercial organization." C.L. § 12-101(c). Of import, "Maryland's usury law . . . defines a 'commercial loan' based on the purposes for which the borrowed money will be used—not based on whether personal assets can be collected when the loan goes unpaid." *Cavalry*, 2023 WL 284449, at *5.

C.L. § 12-103(e) provides (emphasis added):

(e)(1) *A lender may charge interest at any rate if* the loan is:

> (i) A loan made to a corporation;[18]

> (ii) A commercial loan in excess of $15,000 not secured by residential real property; or

---

[18] Maryland's restrictions on interest rates are codified in Title 12 "Credit Regulations" Subtitle 1, titled "Interest and Usury." Subtitle 1 does not contain a definition of the term "corporation." *See* C.L. § 12-101.

24

(iii) A commercial loan in excess of $75,000 secured by residential real property.

(2) Commercial loans to individuals secured by residential real property shall comply with the provisions of § 12-407.1 of this article.

(3) As used in this subsection, residential real property is owner-occupied property having a dwelling on it designated principally as a residence with accommodations for not more than 4 families.

Plaintiff asserts that the Agreement "qualifies for the commercial loan exemption" in C.L. § 12-103(e). ECF 20 at 7. He argues that "Xau is a limited liability company, the loan amount of $10,000 exceeds $5,000, and [the loan] was used for the business purpose of supplying cash for Xau's ATM machine business." *Id.*

Caracillo made a loan of $10,000 to defendants "for the business purpose of supplying cash for Xau's ATM machine business." ECF 1, ¶ 13. Accordingly, it was a commercial loan, as defined in C.L. § 12-101(c). However, this does not mean that the commercial loan exemption, codified at C.L. § 12-103(e)(1), necessarily applies.

Xau is an LLC, not a corporation. *See* C.L. § 12-103(e)(1)(i).[19] And, although plaintiff claims that loans exceeding $5,000 qualify for the exemption, ECF 20 at 7, the exemption applies

---

[19] Curiously, in the Motion and in Caracillo's Declaration in support of the Motion, he claims that "Xau Ventures LLC is a corporation[.]" ECF 20-1, ¶ 10; *see id.* ¶ 11; ECF 20 at 5.

"Maryland recognizes and allows for the formation of various forms of entities, including corporations, limited liability companies, and partnerships[.]" *Comptroller of Maryland v. Broadway Servs., Inc.*, 250 Md. App. 102, 117, 248 A.3d 1117, 1126 (2021), *aff'd,* 478 Md. 200, 272 A.3d 800 (2022). But, "there are . . . significant differences between an LLC and a corporation[.]" *A Guy Named Moe, LLC v. Chipotle Mexican Grill of Colorado, LLC,* 223 Md. App. 240, 250, 115 A.3d 733, 739 (2015), *aff'd but criticized on other grounds,* 447 Md. 425, 135 A.3d 492 (2016). "The LLC is essentially a cross between a corporation (for limited liability purposes) and a partnership (for tax purposes)." *George Wasserman & Janice Wasserman Goldsten Fam. LLC v. Kay,* 197 Md. App. 586, 615, 14 A.3d 1193, 1210 (2011), *abrogated on other grounds by Plank v. Cherneski*, 469 Md. 548, 231 A.3d 436 (2020).

to commercial loans in excess of $15,000, if not secured by residential real property, or in excess of $75,000 if secured by residential real property. *See* C.L. § 12-103(e)(1)(ii), (iii); *see also* 70 Op. Att'y Gen 87, 91 (1985) ("As amended by Chapter 115, a commercial loan not made to a corporation that is less than $15,000 is subject to the applicable limitations on the rate of interest set forth in the subtitle even if the loan is not secured by a lien on residential real property. Accordingly, the prior authorization to lend free of interest limitations if the loan were a commercial loan in excess of $5,000 has been altered by Chapter 115.").

Therefore, for two reasons, the exemption under C.L. § 12-103(e)(1) is inapposite. It follows that the commercial loan at issue is not subject to the commercial loan exemption. And, because the Agreement's interest rate is greater than what is legally permissible, it is usurious. *See Dauda*, 2024 WL 4007946, at *10.

Of import, "[i]f a contract contains a usurious rate of interest, Maryland law establishes penalties for lenders who charge usurious interest rates." *Id.* Section 12-114(b)(1) provides (emphasis added):

> Any person who violates the usury provisions of [Md. Code, Com. Law § 12-103] shall forfeit to the borrower the greater of: (i) three times the amount of interest and charges *collected* in excess of the interest and charges authorized by this subtitle; or (ii) the sum of $500.

In my view, the applicable legal interest rate here is 18% per annum simple interest as to the unpaid principal loan amount of $10,000. C.L. § 12-103(a)(3). This is because the loan is either unsecured or secured by the pledge of "collateral" other than a savings account.[20] Plaintiff

---

Throughout the case, plaintiff has referred to Xau as an LLC. Furthermore, Xau Ventures LLC is registered as an LLC with the state of Maryland. *Xau Ventures LLC,* MARYLAND BUSINESS EXPRESS, https://perma.cc/S27S-Z5F7 (last accessed June 30, 2026). Accordingly, Xau is not a corporation.

[20] The Agreement identifies the Borrower's "business assets, including any cash and business personal property" as "Collateral." ECF 1-1, § 2.1; *see id.* at 2.

has not *collected* any money towards the payment of defendants' debt. Therefore, the Court must subtract $500 from whatever award plaintiff receives, in accordance with C.L. § 12-114(b)(1)(ii). *See S100, Inc. v. Odili,* TDC-22-0411, 2022 WL 5247569, at *7 (D. Md. Oct. 6, 2022) ("[T]he remedy for a violation of the cited Maryland usury law is payment of a penalty and the effective reduction of the interest rate, not dismissal of a claim for recovery of unpaid interest. Accordingly, the fact that the interest rate appears to violate a Maryland usury law does not warrant dismissal of this claim.")

I turn to the "Loan Fee" of $2,000, set forth in the Agreement. ECF 1-1 at 2. As discussed, this fee is properly categorized as interest, and therefore is subject to the restrictions on interest rates codified at C.L. § 12-103. A $2,000 Loan Fee for a loan of $10,000 is greater than 18% simple interest per annum. Rather, it is equivalent to a 20% interest rate.

In the Motion, plaintiff does not seek pre-judgment or post-judgment interest. *See* ECF 20. However, in the Complaint plaintiff sought "judgment in the principal amount of $85,000 plus pre- and post-judgment interest, and the costs of this proceeding[.]" ECF 1 at 12. "The purpose of pre-judgment interest is to compensate the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds." *Pellet v. Pellet*, 267 Md. App. 539, 555, 347 A.3d 459, 469 (2025) (citation and quotation marks omitted).

The Court shall award plaintiff interest on the sum due under the Agreement. This operates, in effect, as an award of pre-judgment interest. *See Constellation Newenergy Inc. v. Brown & Brown Grp. Inc.*, ABA-25-1787, 2026 WL 1101956, at *5 (D. Md. Apr. 23, 2026) (asking plaintiff "to file supplemental briefing specifying the amount of interest owed pursuant to the language of the agreements at issue" to enable plaintiff to "recover pre-judgment interest").

Approximately two years and four months (2.3 years) have passed since March 8, 2024, the date defendants were obligated to repay the plaintiff. *See* ECF 1-1 at 2. Applying an 18% simple interest rate per annum to the principal amount, $10,000, defendants owe a total of $14,140 in principal and interest.[21] But, because the fees in the Agreement ($1,000 per week in late fees and $2,000 in Loan Fee) constitute interest, at a rate that is usurious, the Court must deduct $500 from the award to plaintiff, pursuant to C.L. § 12-114(b)(1). This yields a total due and owing from defendants in the sum of $13,640.

As to post-judgment interest, "'[f]ederal law, rather than state law, governs the calculation of postjudgment interest in diversity cases.'" *Cowan*, 2011 WL 2791248, at *4 (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999)). "The post-judgment interest rate on money judgments in federal civil cases is mandatory and governed by statute." *Mahoney v. iProcess Online, Inc.*, 681 F. Supp. 3d 446, 453 (D. Md. 2023). The statute that governs post-judgment interest is found in 28 U.S.C. § 1961. Plaintiff is entitled to post-judgment interest, in accordance with 28 U.S.C. § 1961.

### 2. Enhanced Damages

Plaintiff seeks enhanced damages, in the amount this Court deems appropriate. ECF 20 at 7. Plaintiff claims that he is entitled to enhanced damages because "Defendants failure to appear and defend a case permits an inference of willfulness." *Id.* (citing *Under Armour, Inc. v. Exclusive Innovations, Inc.*, SAG-20-03427, 2021 WL 2042320, at *15 (D. Md. May 21, 2021)).

---

[21] As noted, the Loan Fee constitutes interest but is not recoverable. The Court made the following calculation to determine the amount of interest:

*Interest Due:* $10,000 (Principal) x 0.18 (Simple Interest Rate) x 2.3 (Years) = $4,140.

Accordingly, the total due is the amount of simple interest that accumulated, $4,140, plus the principal, $10,000. This yields a total of $14,140.

Plaintiff cites *Under Armour*, 2021 WL 2042320, in support of his request for enhanced damages. ECF 20 at 7. The case concerned the award of *statutory damages* under the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d). The statutory damages provision of that statute left the amount of damages to the Court's discretion. *Under Armour.*, 2021 WL 2042320, at *7. In contrast, plaintiff cites no statutory authority from which the Court would award what are essentially punitive damages to punish defendants for failing to appear.

"In Maryland, punitive damages are not available in a pure action for breach of contract, even if the breach is malicious." *Biktasheva v. Red Square Sports, Inc.*, 366 F. Supp. 2d 289, 295 (D. Md. 2005). Because plaintiff only brings a breach of contract claim, the Court cannot award punitive damages in this case. Accordingly, plaintiff's request for enhanced or punitive damages is denied.

### 3. Attorneys' Fees and Costs

Caracillo is the prevailing party. And, Caracillo seeks attorneys' fees and costs under the terms of the Agreement. ECF 1-1 at 2; *see* ECF 20 at 7. As stated, § 3.2 of the Agreement provides: "In the event of any dispute pursuant to this Agreement, Lender shall be entitled to collect all attorney's fees, up to the maximum amount allowed by law, necessary to enforce the provisions of this agreement." ECF 1-1 at 2.

Under the terms of the Agreement, Caracillo is entitled to reasonable attorneys' fees. He requests legal fees of $5,000 and $735 in costs. *See, e.g.,* ECF 20 at 7. That request is reasonable.

### a.

In a diversity action such as this, a party's right to recover attorneys' fees is ordinarily governed by state law. *See Rishell v. Computer Sciences Corp.*, 702 Fed. App'x 103, 103 n.* (4th Cir. 2017); *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 451 (1st Cir. 2010); *McCollum v.*

29

*State Farm Ins. Co.*, 376 Fed. App'x 217, 220 (3d Cir. 2010); *Ranger Const. Co. v. Prince William County Sch. Bd.*, 605 F.2d 1298, 1301 (4th Cir. 1979).  With respect to plaintiff's request for legal fees, I shall apply Maryland law.

In general, Maryland follows the "American Rule," under which "a prevailing party is not awarded attorney's fees 'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.'" *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445, 952 A.2d 275, 281 (2008) (quoting *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434, 437 (2005)).  "Contract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland." *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006); *see Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 313 (4th Cir. 2020) (same).

"Maryland law limits the amount of contractual attorneys fees to actual fees incurred, regardless of whether the contract provides for a greater amount." *SunTrust Bank v. Goldman*, 201 Md. App. 390, 398, 29 A.3d 724, 728 (2011). Moreover, "[e]ven in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness." *Myers*, 391 Md. at 207, 892 A.2d at 532; *see also Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 316, 844 A.2d 460, 478 (2004); *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730 ("Current law allows a court to grant only those attorneys' fees it finds reasonable."). Thus, "courts must routinely undertake an inquiry into the reasonableness of any proposed fee before settling on an award." *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1, 5 (2010). The

30

"reasonableness of attorney's fees is a factual determination within the sound discretion of the court." *Myers*, 391 Md. at 207, 892 A.2d at 532.

"'The burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees.'" *Ulico*, 380 Md. at 316, 844 A.2d at 478 (citation omitted). Therefore, the party seeking a fee award must provide "'detailed records'" that specify "'the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged[.]'" *Rauch v. McCall*, 134 Md. App. 624, 639, 761 A.2d 76, 84 (2000) (citation omitted), *cert. denied*, 362 Md. 625, 766 A.2d 148 (2001). "'[W]ithout such records, the reasonableness, *vel non*, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.'" *Id.* at 639, 761 A.2d at 85 (citation omitted).

Maryland courts ordinarily utilize the "lodestar" approach when determining attorneys' fees under fee-shifting statutes. *Friolo v. Frankel*, 373 Md. 501, 504-05, 819 A.2d 354, 356 (2003). However, the Maryland Court of Appeals has held that the lodestar approach is "an inappropriate mechanism for calculating fee awards" under contractual fee-shifting provisions in "disputes between private parties over breaches of contract." *Monmouth Meadows*, 416 Md. at 336, 7 A.3d at 7; *see also E. Shore Title Co. v. Ochse*, 453 Md. 303, 337, 160 A.3d 1238, 1258 (2017) (stating that the "litigation did not involve a fee-shifting statute, and therefore the lodestar method of calculation would not be appropriate"). This is because a "contractual fee-shifting provision is designed by the parties, not by the legislature . . . . Thus, it usually serves no larger public purpose than the interests of the parties." *Congressional Hotel Corp. v. Mervis Diamond Corp.*, 200 Md. App. 489, 505, 28 A.3d 75, 84 (2011).

31

In Maryland, in regard to an award based on a contract, a court "should use the factors set forth in Rule 1.5 [of the Maryland Rules of Professional Conduct ("MRPC")] as the foundation for analysis of what constitutes a reasonable fee when the court awards fees based on a contract entered by the parties authorizing an award of fees." *Monmouth Meadows*, 416 Md. at 336-37, 7 A.3d at 8.

MRPC 1.5(a) enumerates eight non-exclusive "factors to be considered in determining the reasonableness of a fee":

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

A list of factors similar to those in MRPC 1.5 was enunciated for use in a lodestar analysis in the seminal case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). The so-called "*Johnson* factors" have been adopted for use in lodestar cases by the Fourth Circuit, see *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n. 28 (4th Cir. 1978), and in Maryland. *See Friolo*, 373 Md. at 522 n. 2, 819 A. 2d at 366 n. 2.

Cases decided under the lodestar approach can "provide helpful guidance" in contractual fee-shifting cases. *Congressional Hotel*, 200 Md. App. at 505, 28 A.3d at 85. This is because "there is likely to be some overlap between the Rule 1.5 factors and the mitigating factors typically considered in a lodestar analysis." *Monmouth Meadows*, 416 Md. at 337, 7 A.3d at 8.

"In order to apply Rule 1.5 to a fee award, a court does not need to evaluate each factor separately." *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730; *see Monmouth Meadows*, 416 Md. at 337 n.11, 7 A.3d at 8 n.11. Indeed, a court need not "make explicit findings with respect to Rule 1.5" at all, or even "mention Rule 1.5 as long as it utilizes the rule as its guiding principle in determining reasonableness." *Monmouth Meadows*, 416 Md. at 340 n. 13, 7 A.3d at 10 n.13.

Moreover, when conducting an MRPC 1.5 analysis, a court "should consider the amount of the fee award in relation to the principal amount in litigation, and this may result in a downward adjustment. Although fee awards may approach or even exceed the amount at issue, the relative size of the award is something to be evaluated." *Id.* at 337, 7 A.3d at 8. And, a "trial court also may consider, in its discretion, any other factor reasonably related to a fair award of attorneys' fees." *Id.* at 337-38, 7 A.3d at 8.

This Court's Local Rules are also relevant. Local Rule 109.2(b) requires an attorneys' fees motion to be properly supported and prepared in accordance with the Court's "Rules and Guidelines for Determining Attorneys' Fees in Certain Cases," if they are applicable. *See* Local Rules App. B (the "Guidelines"). The Guidelines are applicable here, as they "apply to cases in which a prevailing party would be entitled, by applicable law or contract, to reasonable attorneys' fees . . . ." *Id.* at 1 n.*. Among other things, the Guidelines set out mandatory rules regarding billing format and time recordation, organized by litigation phase, and require submission of

quarterly statements to opposing counsel. *Id.* § 1. It also outlines non-compensable time and reimbursable expenses and sets guidelines for hourly rates for attorneys. *Id.* §§ 2-4.

Under MRPC 1.5(a)(3), a court reviewing an attorneys' fee request must consider "the fee customarily charged in the locality for similar legal services." In this inquiry, the Fourth Circuit follows the "locality rule," whereby "'[t]he community in which the court sits is the first place to look to in evaluating the prevailing market rate.'" *Montcalm Pub. Corp. v. Commonwealth of Va.*, 199 F.3d 168, 173 (4th Cir. 1999) (citation omitted). "Evidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate. However, in the absence of sufficient documentation, the court may rely on its own knowledge of the market." *CoStar Group, Inc. v. LoopNet, Inc.*, 106 F. Supp. 2d 780, 788 (D. Md. 2000) (internal citation omitted).

The Court "recently updated its Guidelines Regarding Hourly Rates in the Local Rules[.]" *Schrider v. Devlin Contracting & Maint., Inc.*, BAH-24-2978, 2026 WL 110330, at *4 (D. Md. Jan. 14, 2026). As to the hourly rates, the Guidelines now provide, Guidelines § 3:

> Reasonable hourly rates should be determined by the Court using declarations, affidavits, stipulations by the parties, or other evidence. A useful guideline for hourly rates may be provided by the Fitzpatrick Matrix[] as adjusted annually, with a reduction of 5% to 20% (to reflect differences between the legal markets in Washington, D.C. and Maryland).

"[T]he Guidelines also make clear that the factors identified in pertinent caselaw still govern, and that a court should determine a reasonable fee award 'in accordance with relevant case law.'" *Hernandez v. Olney Enters., Inc.*, GLS-25-01528, 2026 WL 290967, at *5 (D. Md. Feb. 3, 2026) (quoting Guidelines § 3); *see Tamikka W. v. Bisignano,* GLS-21-00541, 2025 WL 3754144, at *3 (D. Md. Dec. 29, 2025); *Trs. of Plumbers & Gasfitters Loc. 5 Ret. Sav. Fund v. Magothy Mech. LLC*, TDC-25-01249, 2025 WL 3711726, at *8 (D. Md. Dec. 22, 2025).

The Fourth Circuit has indicated that "fee matrices can be 'a useful starting point to determine fees.'" *De Paredes v. Zen Nails Studio LLC*, 134 F.4th 750, 753 (4th Cir. 2025) (quoting *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 (4th Cir. 2009)).  But, a court is not "'bound by'" the ranges specified in a fees matrix.  *De Paredes*, 134 F.4th at 754 (quoting *Newport News Shipbuilding,* 591 F.3d at 229).  Rather, "the court must consider all relevant evidence to determine the prevailing market rates in the relevant community, including lawyer affidavits, fee awards in similar cases, general surveys, fee matrices, and even its own personal knowledge[.]"  *De Paredes*, 134 F.4th at 754 (internal citations and quotation marks omitted).  Indeed, "[w]hen considering a published fee matrix, like the Fitzpatrick Matrix, Loc. R. App'x B.3 (D. Md. 2025), the Court cannot 'elevate a matrix above all other types of evidence or treat a matrix as establishing a presumptive answer or range of answers.'" *Tesfay v. Travel Centers of Am.*, CJC-25-1242, 2026 WL 171710, at *2 (D. Md. Jan. 22, 2026) (quoting *De Paredes*, 134 F.4th at 754).

With this framework, I turn to the Motion.

**b.**

Caracillo's request for attorneys' fees is supported by the Declaration of Erik N. Lund, Esquire and multiple invoices.  ECF 20-3.  Mr. Lund supplemented his Declaration for attorneys' fees, at the request of the Court.  ECF 22-2 (Supplemental Lund Declaration); *see* ECF 21 (Court Order).  Mr. Lund appended four exhibits to his Supplemental Declaration.  They are docketed collectively at ECF 22-2.

Mr. Lund is a partner with the law firm of Whitestone Law, PLLC (the "Firm").  ECF 20-3, ¶ 3.  Mr. Lund claims that the Firm's "billing rate for this matter is a fixed fee." *Id.* ¶ 5.

35

And, "[f]or all work performed on this litigation, Whitestone Law charged a set fee of $5,000." *Id.* ¶ 6. Moreover, "Caracillo has paid Whitestone Law $5,000 for this matter." *Id.* ¶ 7.

As to Mr. Lund's qualifications, he received his J.D. from University of New Hampshire Franklin Pierce School of Law in 2020. ECF 22-2, ¶ 8. And, since 2020, Mr. Lund has "practiced as an intellectual property attorney based in Northern Virginia." *Id.* Mr. Lund became a partner at the Firm in 2022. *Id.* He states: "Since 2022, I have represented parties in at least twenty-eight Federal District Court litigations, two appeals at the U.S. Court of Appeals for the Federal Circuit, and numerous matters in Virginia state court." *Id.*

Mr. Lund claims that his "typical hourly rate for paid litigation engagements is $400/hr–$500/hr." *Id.* ¶ 9. He asserts: "[T]ypical rates for a Virginia lawyer 'run roughly $250 to $475 per hour in 2026 for everyday consumer, family, criminal, estate, real-estate, and small-business work, with a midpoint near $363.' But 'Northern Virginia firms in Fairfax, Arlington, and Alexandria tend to quote well above the $363 midpoint.'" *Id.* ¶ 10 (quoting ECF 22-2 (Javi Perez, *Virginia Lawyer Costs in 2026: What to Expect Before You Hire*, LEGALCOSTGUIDES (June 2026)), at 15, 16).

In support of Lund's request for attorneys' fees, he appended an invoice from the Firm to Caracillo, charging plaintiff $5,000. ECF 20-3 at 13. The invoice states that the $5,000 fee was levied for an "[i]nitial retainer for legal services in connection with preparing and filing a legal complaint against J. Lindsey relating to his failure to perform under the loan/note in the appropriate court." *Id.*

In addition to this invoice, Mr. Lund appended his time entries, recording the time he spent working on this case. ECF 22-2 at 13. The time entries describe the work performed; the dates the work was performed; the length of time expended; and the name of the attorney who performed

36

the work. *Id.* All of the work was performed by Mr. Lund in 2025. *See id.* The time entries reflect that, over roughly an eight month period, Mr. Lund worked 17.6 hours on this case. *See id.* In particular, Mr. Lunds's entries reflect that he conferred with the client, drafted and revised the Complaint, coordinated service of the suit on defendants, and drafted the Motion and supporting exhibits. *Id.* In my view, Mr. Lund's expenditure of time was reasonable.

Although the Firm charged Caracillo a flat fee of $5,000, to aid the Court's determination of whether the requested fee award of $5,000 is reasonable, Mr. Lund assumes that his hourly rate for this matter would have been $363. ECF 22-2, ¶ 11. An hourly rate of $363 is reasonable, and approaches the Fitzpatrick Matrix range for Virginia lawyers with six years of experience ($591.30). *See* Guidelines Appendix B § 3; *The Fitzpatrick Matrix*, FITZPATRICK MATRIX, https://perma.cc/Y9CZ-M7YT (last accessed July 14, 2026).[22]

Applying this rate to the time Mr. Lund devoted to this matter, Mr. Lund asserts the value of his legal services for this case total $6,388.80. ECF 22-2, ¶ 11. Mr. Lund states: "In total, Caracillo has paid Whitestone Law $5,000 for this matter and is seeking this amount as a conservative estimate compared with what an hourly engagement would've cost." *Id.* ¶ 12. I agree. And, in view of the time the Firm spent litigating this matter on behalf of Mr. Caracillo, I find that $5,000 is a reasonable fee award for attorneys' fees.

Additionally, according to Mr. Lund, "plaintiff has incurred the following taxable costs: (1) Clerk's filing fee in the amount of $405.00 for filing of the Complaint, and (2) service of process fees in the amount of $330.00." ECF 20-3, ¶ 4. And, Mr. Lund appended to his declaration receipts

---

[22] The Court reduced the range of rates set forth in the Fitzpatrick Matrix by 10%, as suggested by the Local Rules, to correspond with the lower hourly rates for lawyers involved in federal litigation in Virginia, as compared to the District of Columbia. *See* Guidelines Appendix B § 3 (suggesting the diminution of rate for attorneys practicing in Maryland as compared to Washington DC).

that substantiate those costs. ECF 20-3 at 5–6, 8–11. These are reasonable expenses that are recoverable as part of the cost of litigation. *See Carroll v. Paul L. Off., PLLC,* DKC-12-2041, 2013 WL 4008873, at *4 (D. Md. Aug. 2, 2013) ("Filing fees and service process fees are reasonable costs of litigation that may be recovered."). Although language in the Agreement only applies to attorneys' fees, not costs, Fed. R. Civ. P. 54(d) provides that a prevailing party is entitled to an award of costs incurred unless a federal statute, the Federal Rules of Civil Procedure, or a court order provides otherwise. Here, no such impediment exists. Therefore, I shall award plaintiff $735 in costs.

In sum, I shall award attorneys' fees of $5,000 and costs of $735.

## IV. Conclusion

For the reasons stated, I shall enter judgment in favor of plaintiff and against Xau and Joshua Lindsey, jointly and severally, in the following amounts:

| | |
|---|---:|
| Damages | $13,640.00 |
| Legal Fees and Costs | $5,735.00 |

An Order follows.

Date: July 24, 2026                                    /s/
                                                Ellen Lipton Hollander
                                                United States District Judge

38